*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

AUTO CLUB INSURANCE ASSOCIATION,

Plaintiff-Appellee,

v

CORPORATE LIMOUSINE INC,

Defendant-Cross Defendant,

and

AMERICAN COUNTRY INSURANCE COMPANY,

Defendant-Third Party Plaintiff-
Cross Plaintiff-Appellant,

and

AUTO OWNERS INSURANCE COMPANY,

Third Party Defendant-Appellee.

UNPUBLISHED
June 17, 2021

No. 345965
Macomb Circuit Court
LC No. 2016-003931-NF

Before: REDFORD, P.J., and BORRELLO and TUKEL, JJ.

PER CURIAM.

American Country Insurance Company (American Country) appeals as of right a judgment entered in favor of Auto Club Insurance Association (Auto Club) in the amount of $744,931.62. This amount represented the amount of personal protection insurance (PIP) benefits Auto Club paid to nonparty Brian Miller arising out of a vehicle-pedestrian collision that left him with lifelong injuries. On appeal, American Country challenges the trial court's decision to summarily dismiss its third-party claim against Auto Owners Insurance Company (Auto Owners), the insurer of Miller's father's automobile; the trial court's decision to decline to rescind the policy that American Country issued to Corporate Limousine Inc., the owner of the vehicle involved in the

-1-

collision; and the trial court's decision to deny American Country summary disposition on Auto Club's reimbursement claim based on the doctrine of laches. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

On July 21, 2011, pedestrian Brian Miller was struck by a Dodge Caravan owned by defendant Corporate Limousine and purportedly insured by defendant American Country. Because Miller did not have his own automobile insurance and did not live with anyone who did, he filed an application for PIP benefits under the Michigan Assigned Claims Plan (MACP). Plaintiff Auto Club was assigned to adjust Miller's claim, and it alleged that, at the time it filed this lawsuit, it had paid approximately $635,232.15 in PIP benefits and had incurred $39,458.15 in lost adjustment costs. Relevant to this appeal, Auto Club alleged that American Country was liable to it in those amounts plus any future amounts, because American Country was the highest-priority no-fault insurer as the insurer of the Dodge Caravan.

Almost one year after Auto Club filed its complaint, American Country filed a cross-complaint against Corporate Limousine, alleging that it was entitled to rescind the policy at issue based on fraud, alleging that Corporate Limousine committed fraud by requesting coverage for the Caravan after that accident occurred but without disclosing that it had already occurred. Around this same time, American Country filed a third-party complaint against Auto Owners arguing that Auto Owners insured Miller's father, that Miller was domiciled at his father's house at the time of the accident, and that Auto Owners was therefore the highest-priority no-fault insurer.

American Country moved for summary disposition of Auto Club's complaint, arguing in part that it was not the highest-priority no-fault insurer, arguing that Miller was domiciled at his father's house. In support of its claim, American Country pointed to the fact that Miller's father's address was identified as Miller's address on the police report; his medical records; his MACP application for benefits; his driver's license; that he received some mail at his father's house; and the fact that he moved into his father's house after being released from the hospital after the July 21, 2011 accident. Auto Club argued that Miller was not domiciled at his father's house, pointing to the testimony of Miler's father and stepmother that he had not resided at their home since 2007 and had left his father's house to live in two separate marital homes.

Auto Owners also moved for summary disposition, arguing that it was not the highest-priority no-fault insurer, or even in the order of priority at all, because Miller was not a resident-relative at his father's house. Specifically, Auto Owners argued that based on the testimony of his father and stepmother, it was clear that Miller had not resided there in several years and had no plans to return.

In its April 26, 2018 opinion and order, the trial court determined that because "the material facts of this case are not in dispute," "the issue of Mr. Miller's domicile is a question of law." The trial court found that "Miller was not domiciled in his father's household," reasoning:

> Examining the various factors and evidence provided, there is evidence that Mr. Miller has not resided in his father's residence since approximately 2007 and has since been married twice and had a different domicile with each wife. Further,

evidence has been provided that Mr. Miller did not have a bedroom or place to stay in his father's residence, he did not keep his belongings at his father's residence, and only received junk mail at his father's residence. Although evidence was provided Mr. Miller did retain his father's address as his mailing address and used his father's address on his driver's license and other documents, these facts are outweighed by the other evidence provided. Therefore, this Court finds that Mr. Miller was not domiciled in his father's household at the time of the accident…

Because it determined that Miller was not domiciled at his father's house on the date of the accident, the trial court concluded that American Country, not Auto Owners, was the highest-priority automobile insurer.

Thereafter, American Country moved for entry of a default judgment of rescission on its cross-claim against Corporate Limousine, arguing that recession was mandated because Corporate Limousine committed fraud in seeking to add the vehicle without informing the insurance agent about the Miller accident. In response, Auto Club argued that American Country's motion was nothing more than another effort to avoid the duties imposed by its own policy, and that there was no admissible evidence to support American Country's fraud allegations. Further, American Country's cross-claim was time-barred under the applicable statute of limitations. Finally, Auto Club faulted American Country for failing to attempt to rescind the policy for more than five years despite being aware of the accident as early as the month it happened.

The trial court denied American Country's motion for entry of a judgment of rescission. Thereafter, the trial court weighed the equities between what it viewed as two equally innocent parties that would be impacted by a rescission of the policy and was "convinced that granting the rescission would result in an unjust and inequitable result because [Auto Club's] only recourse would be to file a claim against" Corporate Limousine. In accord with this finding, the trial court dismissed American Country's third-party claim against Auto Owners. Shortly thereafter, American Country filed its final motion for summary disposition based on the doctrine of laches. American Country argued that Auto Club's claims against it were barred under the doctrine of laches because Auto Club waited to file this lawsuit for more than five years despite knowing as early as 2011 that American Country "was potentially an insurer of higher priority."

In its response, Auto Club argued, in relevant part, that its claim against American Country was not time-barred by the relevant statute of limitations and that as a result, the doctrine of laches was simply inapplicable. In accord with its position, Auto Club filed a motion for entry of judgment, asserting that in the event the trial court ultimately denied American Country's motion for summary disposition, it was entitled as a matter of law to a judgment in its favor against American Country in the amount of $767,356.94.[1]

The trial court denied American Country's motion for summary disposition based on the doctrine of laches. The trial court held that the doctrine of laches was inapplicable because Auto

---

[1]This number reflected $722,506.29 in PIP benefits already paid to Miller and $44,850.65 in loss adjustment costs.

Club filed its claim against American Country within the relevant six-year statute of limitations. In light of that and its previous summary-disposition decisions, the trial court concluded that a judgment in Auto Club's favor was the only remaining potential outcome. Of the $767,356.94 requested by Auto Club, American Country disputed "$44,850.65 in loss adjustment costs," and the trial court ultimately split the difference, "adopt[ing] fifty percent of that cost" and entering a judgment in Auto Club's favor in the amount of $744,931.62. This appeal followed.

## II. ANALYSIS

American Country's first argument on appeal focuses on which company was the highest-priority no-fault insurer for Miller's claim. As previously stated, this question turned on whether Miller was domiciled in his father's house.

"Michigan's no-fault act generally abolishes tort liability arising from the ownership, maintenance, or use of a motor vehicle." *Grange Ins Co of Mich v Lawrence*, 494 Mich 475, 490; 835 NW2d 363 (2013). "Instead," the Michigan Supreme Court has explained, individuals injured in motor vehicle accidents turn to Michigan insurance companies for first-party no-fault insurance benefits, which are often referred to as PIP benefits. *Id*. "In this regard, MCL 500.3114(1) . . . provides the general rule for determining which Michigan insurer is liable to provide PIP benefits." *Id*. That statutory provision provides, in relevant part, that "a personal protection insurance policy . . . applies to accidental bodily injury to the person named in the policy, the person's spouse, and *a relative of either domiciled in the same household*, if the injury arises from a motor vehicle accident." MCL 500.3114(1) (emphasis added). The italicized portion—specifically the term "domiciled"—is the crux of this issue.

"A domicile determination is generally a question of fact; however, where the underlying material facts are not in dispute, the determination of domicile is a question of law for the circuit court." *Grange Ins Co of Mich*, 494 Mich at 489-490. Questions of law are reviewed de novo. *Loweke v Ann Arbor Ceiling & Partition Co*, 489 Mich 157, 162; 809 N2d 553 (2011). "[T]he no-fault act does not define the term 'domiciled' " but the term "has a acquired a particular meaning in the law" and, therefore, must be construed accordingly. *Grange Ins Co of Mich*, 494 Mich at 492-493.

"Michigan courts have defined 'domicile' to mean 'the place where a person has his true, fixed, permanent home, and principal establishment, and to which, whenever he is absent, he has the intention of returning.' " *Id*. at 493 (citations and internal quotation marks omitted). A person cannot have more than one domicile at the same time. *Id*. at 493-494. Accordingly, a person "retains his domicile of origin [upon his birth] until he changes it, by acquiring another; and so each successive domicile continues, until changed by acquiring another. And . . . the acquisition of a new domicile does, at the same instant, terminate the preceding one." *Id*. (citations omitted). However, although a person can have only one domicile at a time, a person can have multiple residencies. *Id*. at 494. A "domicile is acquired by the combination of residence and the intention to reside in a given place, and can be acquired in no other way. . . . If the intention of permanently residing in a place exists, a residence in pursuance of that intention, however short, will establish a domicile." *Beecher v Common Council of Detroit*, 114 Mich 228, 230; 72 NW2d 206 (1897). Therefore, the "inquiry into a person's 'domicile[]' . . . is generally a question of intent, but also

-4-

considers all the facts and circumstances taken together." *Grange Ins Co of Mich*, 494 Mich at 495.

To assist courts in determining where someone is domiciled, our Supreme Court has identified various nonexhaustive factors to consider, including the following:

- "the subjective or declared intent of the person of remaining, either permanently or for an indefinite or unlimited length of time, in the place he contends is his 'domicile' or 'household' "

- "the formality of the relationship between the person and the members of the household"

- "whether the place where the person lives is in the same house, within the same curtilage or upon the same premises"

- "the existence of another place of lodging by the person alleging 'residence' or 'domicile' in the household[.]" [*Workman v Detroit Auto Inter-Ins Exch*, 404 Mich 477, 496-497; 274 NW2d 373 (1979).]

Here, Miller's father acknowledged that Miller was residing at his house at the time of the deposition, that "[h]e's got mail at [his] house ever since we moved there," and that he "never, ever changed his address no matter where he's moved, when he was married or anything." However, Miller's father testified that Miller did not have a bedroom or anything else at his house at the time of the accident. In fact, Miller's father said he refused to let his son in the home because of drug-related issues he was having prior to the accident. Miller's father explained that his son said "he stayed with some friends . . . in Detroit." According to Miller's father, the last time his son lived at his house "on a permanent basis" was "[r]ight after he got out of the Army whenever that was, and he stayed there for a few months, and then he got a place with his new wife there in Ypsi[lanti] somewhere . . . " After that marriage ended, Miller's father testified, his son remarried and lived with his new wife in Belleville and then Ypsilanti before they too divorced. Miller's father confirmed that, other than the occasional times when Miller stayed over, the last time Miller "actually lived with" him was "after [Miller] got out of the Army" in 2007.

Miller's stepmother testified that Miller lived with them before his marriages, but afterwards "maybe spen[t] a night or two but never officially lived there." She testified that the last time he lived at their home was in 2007 or "maybe even before that." Like her husband, Miller's stepmother denied that Miller had a bedroom there and described the mail that he received there as nothing more than "junk" mail. She denied that anyone would ever come to their home expecting to visit Miller, that packagers were ever sent to him there, or that he stored anything at the home. She testified that "there were definitely not any" plans for Miller to live there until the accident left her and her husband with no choice.

In light of this testimony, the trial court did not err in concluding that Miller neither resided in nor intended to reside at his father's house on the day of the accident. While, as the trial court recognized, "Miller did retain his father's address as his mailing address and used his father's address on his driver's license and other documents," as the trial court also recognized, the strength

of that evidence was "outweighed" by the fact that he "has not resided in his father's residence since approximately 2007" and had no intention of ever returning to live there. We discern no error in the trial court's holdings on this issue. In light of that evidence, no factfinder could reasonably find that Miller had established his father's home as his domicile, as he had not resided there and had no intention of doing so. Accordingly, American Country is not entitled to relief on this issue.

Next, American Country argues that the trial court's decision to decline to rescind the insurance policy American Country issued to Corporate Limousine was erroneous.

A trial court's decision to rescind or decline to rescind an insurance policy is an equitable issue that falls within the sound discretion of the trial court. *Bazzi v Sentinel Ins Co*, 502 Mich 390, 409; 919 NW2d 20, 29-30 (2018). "This Court reviews discretionary decisions of the trial court for an abuse of discretion." *Phillips v Deihm*, 213 Mich App 389, 394; 541 NW2d 566 (1995). "The abuse-of-discretion standard recognizes that there will be circumstances in which there will be more than one reasonable and principled outcome, and selection of one of these principled outcomes is not an abuse of discretion." *Grimm v Treasury Dep't*, 291 Mich App 140, 149; 810 NW2d 65 (2010).

"Generally, [f]raud in the inducement to enter a contract renders the contract *voidable* at the option of the defrauded party . . . ." *Bazzi v Sentinel Ins Co*, 502 Mich at 408 (citation and internal quotation marks omitted; alternation and emphasis in original). This means that "an insurance policy procured by fraud may be declared void *ab initio* at the option of the insurer." *Id.* Consequently, it is as though "the insurance policy is considered never to have existed." *Id.* If an insurance policy is not rescinded, however, its obligations are just as enforceable as they were in the first place. *Id.* at 409, quoting 1 Williston, Contracts (4th ed.), § 1:20, p 76 ("Additionally, '[u]nless rescinded, a voidable contract imposes on the parties the same obligations as if it were not voidable.").

"Because a claim to rescind a transaction is equitable in nature, it 'is not strictly a matter of right' but is granted only in 'the sound discretion of the court.' " *Bazzi*, 502 Mich at 408, quoting *Amster v Stratton*, 259 Mich 683, 686; 244 NW2d 201 (1932). And because the decision whether to rescind an insurance policy is discretionary, "[w]hen a plaintiff is seeking rescission, 'the trial court must balance the equities to determine whether the plaintiff is entitled to the relief he or she seeks.' " *Id.* at 411, quoting *Johnson v QFD, Inc*, 292 Mich App 359, 370 n 3; 807 NW2d 719 (2011). Therefore, "courts are *not* required to grant rescission in all cases." *Id.* (emphasis added). Accordingly, fraud, even fraud in the application, does not "imbue an insurer with an absolute right to rescission of the policy with respect to third parties." *Id.* at 411.

Our Supreme Court has recognized that "rescission should not be granted in cases where the result thus obtained would be unjust or inequitable or where the circumstances of the challenged transaction make rescission infeasible." *Bazzi*, 502 Mich at 410 (citations and internal quotation marks omitted). Consequently, "when two equally innocent parties are affected, the court is required, in the exercise of [its] equitable powers, to determine which blameless party should assume the loss . . . ." *Id.* at 410-411 (citation and internal quotation marks omitted). Ultimately, "[e]quitable remedies are adaptive to the circumstances of each case, and an absolute approach would unduly hamper and constrain the proper functioning of such remedies." *Id.*

"Equity jurisprudence molds its decrees to do justice amid all the vicissitudes and intricacies of life and . . . allows complete justice to be done in a case by adapting its judgments to the special circumstances of the case." *Id*. (citation and internal quotation marks omitted).

In addition to these factors, in his concurrence in *Farm Bureau Gen Ins Co of Mich v ACE American Ins Co*, 503 Mich 903; 919 NW2d 394 (2018) Justice Markman identified additional pertinent factors to consider.[2] In that case, based on its decision in *Bazzi*, our Supreme Court vacated this Court's "opinion only to the extent it held that [the plaintiff-insurer] was automatically entitled to rescission as a matter of law," remanded the matter to the trial court "to determine whether rescission is available as an equitable remedy," and denied leave in all other respects. *Farm Bureau Gen Ins Co of Mich*, 919 NW2d at 394. While Justice Markman concurred in those decisions, he wrote separately to address a "need to establish a coherent and workable *standard* by which the trial court is to exercise its equitable discretion in 'innocent-third-party cases.'" *Id*. at 904 (MARKMAN, J., *concurring*) (emphasis in original). Justice Markman identified "the following nonexclusive list of factors" that courts should consider:

- "[T]he extent to which the insurer, in fact, investigated or could have investigated the subject matter of the fraud before the innocent third party was injured, which may have led to a determination by the insurer that the insurance policy had been procured on a fraudulent basis. If the insurer could have with reasonable effort obtained information indicating that the insured had committed fraud in procuring the insurance policy, equity may weigh against rescission because the insurer may be deemed to have acted without adequate professional diligence in issuing and maintaining the policy." *Id*. at 906.

- "[T]he specific relationship between the innocent third party and the fraudulent insured. If the innocent third party possessed some knowledge of the fraud—perhaps because of a familial or other relationship—equity may weigh in favor of rescission because that individual is seeking to recover from the insurer despite knowledge of the fraud." *Id*.

- "[T]he precise nature of the innocent third party's conduct in the injury-causing event. Where the innocent third party acted recklessly or even negligently in the course of the injury-causing event, equity may weigh in favor of rescission because the innocent third party could have avoided the injury by acting more prudently." *Id*.

---

[2] Recently, this Court adopted Justice Markman's factors when balancing the equities, stating: "We conclude that the factors outlined in Justice Markman's concurrence to render a determination regarding the balance of the equities presents a workable framework as well as necessary guidance to the lower courts and the litigants, and therefore we adopt it as our own." *Pioneer State Mut Ins Co v Wright*, 331 Mich App 396, 411; 952 NW2d 586 (2020).

- "[W]hether the innocent third party possesses an alternative avenue for recovery absent enforcement of the insurance policy. Such an avenue for recovery may include, for example, the assigned claims plan or health insurance. Where the innocent third party possesses an alternative means of recovery, equity may weigh in favor of rescission because the insurer need not suffer loss because of fraud." *Id*. at 906-907.

- "[W]hether enforcement of the insurance policy would merely relieve the fraudulent insured of what would otherwise be the insured's personal liability to the innocent third party. That is, whether enforcement of the insurance policy would subject the insurer to coverage for tort liability for an at-fault insured. In such a case, equity may weigh in favor of rescission because enforcement of the policy would transfer liability to the innocent third party from the insured who committed the fraud to the insurer that did not commit wrongdoing." *Id*. at 907.

"In few cases will all of these factors be applicable; in some cases, none will be applicable; and in other cases, additional factors may be applicable," Justice Markman explained. *Id*.

Justice Markman went on to hold:

[B]ecause the burden of establishing a right to rescission lies with the party seeking rescission, the defrauded insurer bears the burden of establishing that rescission is warranted. Thus, where neither party is more or less "innocent" than the other, it would seem to be the case that the insurer has failed to satisfy its burden of proof and rescission would not be warranted with respect to the third party. [*Farm Bureau Gen Ins Co of Mich*, 503 Mich at 905-906 (MARKMAN, J., *concurring*), citing *Gardner v Thomas R Sharp & Sons*, 279 Mich 467, 469; 272 NW 871 (1937).]

We conclude that the trial court's decision that American Country failed to meet its burden with respect to rescission did not fall beyond the range of principled outcomes. As the trial court concluded and all parties seemingly agree, American Country and Auto Club are both equally innocent when it comes to Corporate Limousine's purported fraud. American Country was the party purportedly defrauded when Corporate Limousine requested insurance coverage for the vehicle involved in the accident after the accident had occurred. While there was no evidence supporting the allegation that Corporate Limousine specifically asked for coverage before the accident, the fact that Corporate Limousine requested coverage for a vehicle on the same day as the accident without disclosing that the same vehicle had been involved in an accident earlier that day involves no misconduct by American Country. Likewise, however, Auto Club was merely assigned by the MACP to administer Miller's claim for PIP benefits, meaning it engaged in no misconduct. Consequently, "neither party is more or less 'innocent' than the other . . . " *Farm Bureau Gen Ins Co of Mich*, 503 Mich at 905 (MARKMAN, J., *concurring*), citing *Gardner*, 279 Mich at 469.

Both in the trial court and on appeal, American Country has been unable to point to any factor that would make Auto Club (or Miller for that matter) less innocent. Nevertheless, relying

primarily on the fourth factor discussed above—the availability of other avenues of relief—American Country claims that rescission is warranted because Auto Club would be reimbursed by the MACP. Indeed, according to American Country, "rescission should have been granted to American Country" "[o]n this factor alone." While that is an accurate understanding of the fourth factor identified by Justice Markman, "such an avenue for recovery may include, for example, the assigned claims plan or health," *Farm Bureau Gen Ins Co of Mich*, 503 Mich at 906 (MARKMAN, J., *concurring*), that factor is just one of many applicable considerations under a nonbinding concurrence that might be relevant here. Still, American Country argues:

> The trial court also erred when it relied on the fact that Auto Club's "only recourse would be to file a claim against" Corporate Limousine, which is presumably uncollectible. The same is true of American Country, so the equities are equal on that score, except that Auto Club is reimbursed by assessments against all auto insurers (including American Country) and thus any loss is spread out to all insurers, not just one – American Country. That, of course, was the rationale behind the Assignment Claims plan- the spreading of the risks among all insurers where there is no other insurance.

While there is merit to this argument, here, it would be error to hold that factor alone should govern where (1) other facts are to be considered, (2) the decision is discretionary, and (3) this factor would almost always result in an automatic reversal of the burden of proof in cases involving the MACP or an MACP-assigned insurer because in those cases, even if the party seeking rescission and the MACP-assigned insurer are equally innocent, this fourth factor would *always* weigh against the MACP-assigned insurer. In short, the record reflects that neither American Country nor Auto Club was more or less innocent than the other. While it is possible that this Court may have decided this issue differently, as we previously stated, "[t]he abuse-of-discretion standard recognizes that there will be circumstances in which there will be more than one reasonable and principled outcome, and selection of one of these principled outcomes is not an abuse of discretion." *Grimm*, 291 Mich App at 149. Here, following our review of the record we conclude that the trial court's findings and conclusions were not outside the range of principled outcomes. *Id.* Accordingly, American Country is not entitled to relief on this issue.

Next, American Country argues that it was entitled to the dismissal of Auto Club's claim because Auto Club waited too long to file this lawsuit. The trial court rejected this argument, holding that the doctrine of laches is inapplicable to claims that are filed within the applicable statute of limitations. The trial court's assertion of binding law was correct.

This Court "review[s] a trial court's application of the doctrine of laches for clear error. 'A decision is clearly erroneous where, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made.' " *Wayne County v Wayne County Retirement Comm*, 267 Mich App 230, 252; 704 NW2d 117 (2005), quoting *Kitchen v Kitchen*, 465 Mich 654, 661-662; 641 N2d 245 (2002). "The doctrine of laches is a tool of equity that may remedy the general inconvenience resulting from delay in the assertion of a legal right which it is practicable to assert." *Id.* (citations and internal quotation marks omitted). It "applies to cases in which there is an unexcused or unexplained delay in commencing an action and a corresponding change of material condition that results in prejudice to a party." *Id.* (citations and internal quotation marks omitted).

Our Supreme Court addressed the application of the doctrine of laches in the context of insurance-payment reimbursements in *MEEMIC v Morris*, 460 Mich 180; 596 NW2d 142 (1999). In that case, Celia Wooten was "totally disabled" in a December 1988 automobile accident, and MEEMIC, Wooten's insurer, immediately began paying work-loss benefits to her. *Id*. at 183. Shortly thereafter, Wooten began receiving social security disability (SSD) benefits retroactive to June 1989, a determination MEEMIC learned about in August 1989, approximately two months later. *Id*. at 184. Nevertheless, MEEMIC continued paying work-loss benefits to Wooten. *Id*. Approximately two years later, in June 1991, MEEMIC advised Wooten's conservator that it intended to offset the benefits it was paying against the SSD benefits and seek reimbursement for the amounts overlapping the SSD payments it had previously made. *Id*. at 184-185. When Wooten did not comply, MEEMIC sued. *Id*. at 185.

Despite the lengthy delay between the accident, MEEMIC's learning of the SSD payments, and MEEMIC's lawsuit, the trial court concluded that the claim was not time-barred under the applicable six-year statute of limitations. *MEEMIC*, 460 Mich at 185. Because it also determined that Michigan caselaw "mandated that MEEMIC be reimbursed the amount Ms. Wooten was overpaid as a result of receiving social security benefits," the court granted summary disposition in MEEMIC's favor and ordered reimbursement. *Id*. "The court, however, limited the amount of the reimbursement to the amount of overpayment Ms. Wooten received in the third and final year in which work loss benefits were paid by MEEMIC" "based . . . on the doctrine of laches . . . ." *Id*. This Court reversed that limitation and remanded the matter for "the judgment [to] be modified to reflect MEEMIC's right to full reimbursement of the social security disability benefit setoff amount." *Id*. at 186.

Our Supreme Court likewise rejected Wooten's reliance on the doctrine of laches, explaining, in full, as follows:

> Defendant Wooten argues that the trial court did not abuse its discretion by applying the doctrine of laches to limit MEEMIC's reimbursement. The doctrine of laches is concerned with unreasonable delay, and it generally acts to bar a claim entirely, in much the same way as a statute of limitation. Here, because MEEMIC filed this case within the six-year period of limitation, any delay in the filing of the complaint was presumptively reasonable, *and the doctrine of laches is simply inapplicable*. As noted above, we agree with defendant that equity requires the trial court to consider whether MEEMIC notified defendant that it would seek reimbursement, and whether such notification was unreasonably delayed. However, *the failure or delay in notification does not act to shorten a period of limitation*. Instead, it simply acts to shift the burden onto plaintiffs to show that reimbursement is equitable. *[MEEMIC*, 460 Mich at 200 (emphasis added).]

Here, it is undisputed that Auto Club filed its lawsuit against American Country within the applicable statute of limitations. Under *MEEMIC*, 460 Mich at 200, "because [Auto Club] filed this case within the six-year period of limitation, any delay in the filing of the complaint was presumptively reasonable, *and the doctrine of laches is simply inapplicable*." (Emphasis added.) Any conclusion to the contrary would "act to shorten a period of limitation," something that the Michigan Supreme Court has made clear the doctrine of laches simply will not do. *Id*. This is precisely the reasoning that the trial court relied on in reaching its decision, and American Country

-10-

does not offer any meaningful challenge to that reasoning on appeal. Accordingly, American Country is not entitled to relief on this issue.

Affirmed. Appellees having prevailed in full are entitled to costs. MCR 7.219(A) and (F).

/s/ James Robert Redford
/s/ Stephen L. Borrello
/s/ Jonathan Tukel